Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/15/2018 08:09 AM CDT

SAMUEL E. FALES, APPELLEE, V.
SANDY L. FALES, APPELLANT.
___ N.W.2d ___

Filed May 1, 2018.    No. A-17-645.

1.  **Divorce: Appeal and Error.** In actions for dissolution of marriage, an
    appellate court reviews the case de novo on the record to determine
    whether there has been an abuse of discretion by the trial judge.
2.  **Child Custody: Appeal and Error.** In child custody cases, where the
    credible evidence is in conflict on a material issue of fact, the appellate
    court considers, and may give weight to, the fact that the trial judge
    heard and observed the witnesses and accepted one version of the facts
    rather than another.
3.  **Words and Phrases.** The acts of abuse defined in the Protection from
    Domestic Abuse Act are those committed against household members
    and include attempting to cause or intentionally and knowingly causing
    bodily injury and placing, by means of credible threat, another person in
    fear of bodily injury.
4.  ____. Threatening to cause or actually causing bodily injury to a spouse
    or former spouse qualifies as domestic intimate partner abuse.
5.  **Appeal and Error.** An appellate court is not obligated to engage in an
    analysis that is not necessary to adjudicate the case and controversy
    before it.

Appeal from the District Court for Loup County: MARK D.
KOZISEK, Judge. Judgment vacated, and cause remanded for
further proceedings.

Sara K. Houston for appellant.

Nathan T. Bruner and Loralea L. Frank, of Bruner Frank,
L.L.C., for appellee.

RIEDMANN and BISHOP, Judges, and INBODY, Judge, Retired.

Riedmann, Judge.

Sandy L. Fales appeals from the order of the district court for Loup County which dissolved her marriage to Samuel E. Fales and granted custody of their minor child to Samuel. Sandy argues on appeal that the court abused its discretion in awarding Samuel custody. Because the district court failed to make special written findings as required by Neb. Rev. Stat. § 43-2932(3) (Reissue 2016), we vacate the district court's order and remand the cause for further proceedings.

## FACTUAL BACKGROUND

Sandy and Samuel were married in 2010, and their child, Samuel Ellis Wayne Fales (Ellis), was born in May 2012. The parties separated in the spring of 2015, and Samuel filed for dissolution of the marriage in June 2015. Each party requested custody of Ellis. In a temporary order, the district court awarded custody of Ellis to Sandy and granted Samuel parenting time of every other weekend, as well as 1 week per month.

At the March 2017 trial, evidence was presented as to the strengths and weaknesses of the parties relating to their fitness for custody of Ellis. Samuel operates the family cattle ranch with his father and brother. He has lived in the same family home since he was 8 years old, and his father lives nearby. He described a caring, involved extended family. Samuel testified that he provides a stable environment for Ellis and that he plays with Ellis while ensuring that Ellis naps, reads, attends church, and helps with household chores.

Sandy stated that she first moved to the ranch shortly after the parties married in 2010 and that she has been the primary caregiver for Ellis and her 12-year-old daughter from a previous relationship. Sandy obtained an associate of arts degree in 2010 and has pursued a career as a photographer, although her earnings have been nominal. Sandy initially testified that Samuel permitted her to have few friends and would not allow her to work outside the home. However, she later acknowledged that the ranch itself was rural and secluded but that Samuel allowed her to go places, purchasing a car for her to

drive, and that she did, in fact, participate in activities. Sandy said she ultimately decided to leave the marriage in June 2015 after concluding that the marriage was no longer working and that she and Samuel were constantly fighting. She described the feeling of "walking on eggshells," stating that Samuel continually yelled at her and called her names.

Sandy does not have a close relationship with her extended family. When she first left the family home, she had a number of short-term living arrangements, including a safe house and a home owned by the man with whom she was involved at the time. She and Ellis stayed with her mother for about 30 days before her mother asked her to leave, after which she stayed for several weeks at yet another safe house. Sandy testified that she now resides in Colorado Springs, Colorado, with Ellis and her daughter. Sandy is working toward earning a bachelor's degree at a local university.

Sandy explained that she had left the family home intermittently beginning in April 2015, returning on some weekends for photography engagements and to see Ellis. At some point, Samuel learned that Sandy had become involved with a man in Colorado and planned a permanent move there. There is no dispute that a serious domestic incident occurred during Sandy's last visit to the family home in June. Becoming enraged at Sandy's refusal to allow him to read texts on her cell phone, Samuel smashed the cell phone; handcuffed Sandy, who had emerged wet and naked from the shower; and restrained her on a bed. Ellis witnessed some of this disturbing scene, and after Samuel led Ellis out of the room, he returned to the bedroom where he reached for a loaded shotgun and held it under his chin while threatening suicide. The incident resulted in Samuel's misdemeanor convictions for third degree assault and "[a]ttempt of a class 3A or 4 felony," as well as a 1-year protection order against him as to Sandy. Samuel is still serving a 48-month term of probation.

Samuel subsequently sought treatment from a clinical therapist, who was a licensed independent mental health practitioner. She treated him with cognitive therapy. The therapist

testified that the disintegration of the marriage triggered in Samuel post-traumatic stress disorder from earlier childhood trauma, as well as a depressive episode. However, she testified that Samuel had made excellent progress. She described Samuel as a "respected rancher" in the community. She stated that he was now "extremely stable" and that she was very confident he could deal with life changes. The therapist opined that Samuel is "an excellent parent [and] deserves the right to parent his child."

Samuel asserted that Ellis' health regularly deteriorated while in Sandy's care and that he often took Ellis to doctor appointments following Ellis' time with Sandy. Samuel testified that Ellis lost weight after Sandy first took him from the family home and that he regained some of the weight while in Samuel's care. Ellis had a recurrent rash on his upper lip from excess moisture on his lip for extended periods. Ellis' family physician diagnosed him with impetigo and regularly treated him for a number of common ailments, such as rashes, cough, elevated temperature, colds, and fever. Nonetheless, the physician stated that he could not attribute poor parenting as the cause of Ellis' several visits with the physician.

The district court found that both parents were fit and that both had developed a strong bond with Ellis. However, the court noted that Ellis required medical intervention about one-half of the times that Samuel exercised his parenting time, which was after Ellis spent time with Sandy. While acknowledging that these medical problems did not necessarily imply failure on Sandy's part, the court found that Samuel was more attentive to Ellis' personal hygiene and physical needs. The court pointed to Ellis' weight loss while with Sandy, his recurring impetigo, and an incident with head lice, as well as a picture of Ellis' exhibiting long, dirty fingernails and toenails, which the court deemed a reflection on the lack of attention to Ellis on Sandy's part.

Turning to the evidence of domestic abuse, the court noted that the June 2015 incident, while not the sole incident between the parties, "was by far the worst." The court

summarized other instances in which Samuel had thrown, broken, or burned things and otherwise acted inappropriately. The court found that there was credible evidence of abuse inflicted by Samuel on Sandy, but no credible evidence of child abuse or neglect.

The court stated that both parents are capable of parenting Ellis and had the emotional maturity and financial ability to raise Ellis and tend to his physical, emotional, and educational needs. However, the court found that Samuel provided the more stable environment. The court noted that Samuel and his family provide a loving, nurturing environment for Ellis, while Sandy has no close family ties and any friends she has in Colorado are new with no known ties to Ellis. The court considered Ellis' relationship with Sandy's daughter and concluded that, given the difference in age and sex, separating the half siblings would not have a detrimental effect on Ellis.

The court rejected Sandy's contention that she initially left Ellis with Samuel because he would not permit her to take Ellis. The court found that Sandy left Ellis with Samuel as "a matter of convenience rather than a product of threats." The court further noted that Sandy's move over 400 miles away has impacted Samuel's ability to visit with Ellis and that, in so doing, Sandy had "placed her own agenda ahead of Ellis" with little regard for the move's effects on the strong relationship between Samuel and Ellis.

In awarding custody of Ellis to Samuel, the court considered the fact that Samuel had committed domestic intimate partner abuse. However, the court noted that Samuel had continued counseling to deal with the issues, which may have led to the incident of abuse, and that now "[h]e deals with the breakdown of the parties' marriage in a more mature and reasonable manner." The court also considered the lack of credible evidence of child abuse or neglect by either party and pointed to Sandy's own parenting plan that suggested the parties meet for visitation exchanges in person, which the court felt indicated that she was not greatly concerned about contact with Samuel. Because those exchanges would be in a public

place, the court concluded that the parenting plan contained reasonable limits calculated to protect Sandy from harm. The parenting plan limited communication between the parties to email or text unless otherwise agreed, and it prohibited them from speaking negatively about the other parent or inquiring about the other's personal affairs through Ellis.

Sandy has timely appealed from this order.

## ASSIGNMENT OF ERROR

Sandy asserts that the district court erred in awarding Samuel sole legal and physical custody of Ellis.

## STANDARD OF REVIEW

[1] In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

[2] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

## ANALYSIS

[3,4] Sandy argues that awarding custody to Samuel constituted an abuse of discretion because Samuel had committed domestic intimate partner abuse against her. She asserts that the district court failed to make the special written findings required under § 43-2932(3) before custody is awarded to a parent who has threatened an intimate partner with imminent

bodily injury. Domestic intimate partner abuse includes "an act of abuse as defined in section 42-903." See Neb. Rev. Stat. § 43-2922(8) (Reissue 2016). The acts of abuse defined in the Protection from Domestic Abuse Act are those committed against "household members" and include "[a]ttempting to cause or intentionally and knowingly causing bodily injury" and "[p]lacing, by means of credible threat, another person in fear of bodily injury." See Neb. Rev. Stat. § 42-903(1)(a) and (b) (Reissue 2016). Spouses and former spouses are considered household members. See § 42-903(3). Thus, threatening to cause or actually causing bodily injury to a spouse or former spouse qualifies as domestic intimate partner abuse.

Through Sandy's testimony and exhibits showing Samuel's misdemeanor convictions for third degree assault and "[a]ttempt of a Class 3A or 4 felony," she was able to show that Samuel had committed domestic intimate partner abuse. That evidence was not disputed by Samuel.

Section 43-2932(1)(b) provides in part: "If a parent is found to have engaged in any activity specified by subdivision (1)(a) of this section, limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm." Section 43-2932(3) provides:

> If a parent is found to have engaged in any activity specified in subsection (1) of this section, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection. The parent found to have engaged in the behavior specified in subsection (1) of this section has the burden of proving that legal or physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent.

When a parent has committed domestic intimate partner abuse, as happened in this case, the obligations of § 43-2932 are mandatory. See *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

In the instant case, the district court found that "there is credible evidence of abuse inflicted by Samuel on Sandy as that term is defined at §42-903." In contrast, the court found "no evidence that Samuel ever acted inappropriately with Ellis. His anger was directed at Sandy and never toward Ellis." In awarding custody to Samuel, the court stated that it had considered Samuel's domestic intimate partner abuse. The court noted:

> [Samuel] has counseled and continues counseling dealing with issues that may have lead [sic] to the circumstances of the domestic abuse. He now deals with the breakdown of the parties' marriage in a more mature and reasonable manner. The court further considers that there has been no credible evidence of child abuse or neglect of Ellis by either party. [Sandy's] own Parenting Plan suggests that the parties meet in Sterling, Colorado for visitation exchanges, implying no great concern on her part of further domestic abuse or the need for an intermediary. Meeting in a public place will most likely prevent [Sandy] from being subject to any further abuse. Limitations on the purpose and method of communication will decrease the potential for conflict. The court finds that the limits in the Parenting Plan are reasonably calculated [to] protect [Sandy] from harm.

The court explicitly found that (1) Samuel had neither abused nor neglected Ellis and, in fact, was consistently a stable and loving parent to him, and (2) adequate protections were made for Sandy's protection. Sandy argues, however, that the absence of special written findings that Ellis can be adequately protected from harm constitutes an abuse of discretion. We agree.

As set forth above, the order explicitly addresses the protection of only Sandy; it does not include any special written findings that Ellis can be adequately protected from harm. Section 43-2932(3) requires the court to make special written findings as to the child *and* other parent. The Nebraska Supreme Court has stated that this obligation is a mandatory

directive. See *Flores v. Flores-Guerrero, supra*. Failure to make such findings precludes the court from awarding legal or physical custody to Samuel. *See id*.

Because the district court failed to comply with the statutory requirement, its award of custody to Samuel constitutes an abuse of discretion. See *id*. Therefore, we vacate its custody determination and remand the cause for further proceedings on the complaint. If Samuel is awarded any type of custody, the district court's order must include special written findings that Ellis and Sandy can be adequately protected by any limitations on custody, parenting time, and visitation that the court finds necessary. See § 43-2932(3).

[5] In addition to her concerns about statutory compliance, Sandy argues more generally that the district court wrongly concluded that Ellis' best interests were served in awarding custody to Samuel. However, our decision to reverse the district court's order because it was not in compliance with § 43-2932(3) obviates the need to consider this argument. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

## CONCLUSION

Because of the district court's failure to make special written findings in compliance with § 43-2932(3), we vacate the district court's order awarding custody to Samuel and remand the cause for further proceedings consistent with this opinion.

Judgment vacated, and cause remanded for further proceedings.